UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LARRY MANCIEL,

                      Petitioner,                Case No. 4:23-cv-11106
                                          Hon. Shalina D. Kumar

v.

KIM CARGOR,[1]

                      Respondent.
_____/


**OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

Michigan prisoner Larry Manciel filed this petition for writ of habeas corpus under 28 U.S.C. § 2254. Manciel challenges his Wayne Circuit Court jury trial conviction of first-degree home invasion and unarmed robbery on three grounds: (1) Manciel was denied the effective assistance of counsel for failing to call two defense witnesses, (2) a comment made by the trial court during jury selection prejudiced the defense, and (3) the trial court

_____

[1] The Court substitutes Manciel's current custodian, Warden Kim Cargor, as the proper party Respondent. *See Edwards v. Johns*, 450 F. Supp. 2d 755, 757 (E.D. Mich. 2006); *see also* Rule 2(a), 28 U.S.C. § 2254.

improperly examined witnesses at trial. After careful consideration, the Court finds that the claims are without merit. The Court denies the petition for writ of habeas corpus, denies a certificate of appealability, and denies permission to appeal *in forma pauperis*.

## I.      Factual and Procedural Background

Manciel was charged with the 2012 home invasion and robbery of his elderly neighbor, Floyd Hosea. Manciel was tried and convicted twice. The trial court granted Manciel's motion for a new trial following his first trial, finding that his counsel was ineffective for failing to call three defense witnesses – Jeanetta Harris-Stevens, William Barber, and Diane Sanders. The prosecutor appealed, and the Michigan Court of Appeals affirmed. *See People v. Manciel*, No. 312804, 2015 Mich. App. LEXIS 2478 (Mich. Ct. App. Aug. 14, 2015).

Prior to the retrial, Hosea died and his testimony from the first trial was admitted at the second trial. Hosea testified that on February 7, 2012, sometime between 9:30-11:00 p.m., Manciel broke down his door and entered his apartment. ECF No. 13-22, at 80-82, 97-99. Hosea knew it was Manciel, who lived in the same apartment building, as soon as he saw him. Though Manciel was wearing a mask that partially covered his face, Hosea

could see Manciel's eyes, and he recognized Manciel's voice. Hosea explained that on nice summer days he would often sit outside his first-story apartment and drink beers and talk with other residents. Hosea recognized Manciel as one of the residents he sometimes shared beers with the previous summer. *Id*. at 82-90, 114-16.

Manciel demanded money and struck Hosea in the face. He then grabbed Hosea's pants and suspenders from a chair in his bedroom and ran out. There was over a thousand dollars in one of the pockets. Hosea called police immediately, he told them he knew who robbed him, and he later identified Manciel from a photograph. *Id.* at 88-94.

Sgt. James Johnson testified that he responded to the apartment sometime after midnight. Hosea had a swollen lip and a damaged door. Hosea told Johnson that he knew the man who robbed him, and that he lived in an apartment on the second floor of the building. Johnson had practically no independent recollection of the run, and he mostly referred to his police report during his testimony. The report indicated that Johnson found a glove that had been left behind by the perpetrator, but he did not remember if it was found inside or outside the victim's unit. Johnson was also not certain,

- 3 -

but he believed that he checked to see if Manciel was in his apartment. ECF No. 14-1, at 5-20.

Relevant to one of Manciel's claims, the trial court asked Johnson follow-up questions about where the glove might have been located, what Johnson did to check to see if Manciel was present at the apartment complex, and whether Johnson searched for the missing pants and wallet. Johnson largely responded that he could not remember those details. *Id.* at 20-26.

Next, Lt. Nathan Duda testified that on February 17, 2012, he executed a search warrant at Manciel's apartment. Police found a wallet and suspenders, but they could not be positively identified as belonging to Hosea. *Id.* at 1-13, 29-46. There was confusion during the examination when the term "back brace" was used along with the term "suspenders." The trial court briefly questioned Duda whether he was aware that braces was another word for suspenders. *Id.* at 46.

Officer Royice Hill testified that he arrested Manciel on May 10, 2012. Hill had been conducting surveillance on Manciel's apartment since the date of the incident, but he never saw Manciel there. Manciel was apprehended at a different residential address. *Id.* at 48-56.

The defense called two of the three defense witnesses that had not been called at the first trial - William Barber and Jeanetta Harris-Stevens. Barber testified that on the date of the incident Manciel was at his apartment from 7:00 p.m. until approximately 10:15 p.m. Barber then drove Manciel to his work at a nursing home in Royal Oak. Uncalled defense witness Diane Sanders was Barber's wife, and Barber testified that she was present with Barber and Manciel that evening and drove with them to drop Manciel off at work. *Id.* at 67-80.

Jeanetta Harris-Stevens testified that Manciel worked for her maintenance company and arrived at her Royal Oak location around 10:45 p.m. on February 7, 2012. He stayed until about 3:00 a.m. Harris-Stevens produced an invoice showing Manciel worked from 10:50 p.m. until 1:40 a.m. *Id.* at 90-99.

On cross-examination, Harris-Stevens denied that the date on the invoice was altered from February 2 to February 7. *Id.* at 93-112. Though Stevens claimed on direct examination that she and Manciel were merely friends, she admitted on cross-examination that she hired an attorney for him and sent him money while he was incarcerated. Jail recordings also revealed

intimate conversations where Manciel referred to Stevens as his "woman" and discussed marriage plans. *Id.* at 100-124.

The jury found Manciel guilty, and he was subsequently sentenced to serve consecutive terms of 15 years to 30 years for first degree home invasion and 5 years to 15 years for unarmed robbery.

Following his conviction, Manciel again claimed that he was denied the effective assistance of counsel. Manciel asserted that his trial attorney was ineffective for failing to call Barber's wife, Sanders. He also claimed that his trial attorney failed to call the apartment manager, Barbara West, who he alleged would have testified that the victim and Manciel never socialized outside the apartment building.

The trial court held an evidentiary hearing on these claims.

At the hearing, attorney Rita Young testified that she was an experienced criminal defense attorney who had tried hundreds of cases. Young represented Manciel during the prosecutor's appeal from his first trial and continued to represent him during the second trial. ECF No. 14-5, at 51-58.

Young testified that Manciel was very active in his defense. Young and Manciel discussed and agreed which witnesses the defense would call at the

second trial. ECF No. 14-6, at 7. Young reviewed transcripts from the first trial and the transcripts from the previous post-trial hearings in preparation for trial. *Id.* at 8-10.

Young filed a notice of alibi, listing William Barber, Diane Sanders, and Jeanetta Harris-Stevens. At trial, after talking about it with Manciel, Young chose to call Barber and Harris-Stevens as defense witnesses and not Sanders. *Id.* at 10-19, 28-29.

Young did not interview Sanders, but instead she read Sanders' testimony from the first post-trial hearing. Young determined that Sanders had not testified well at the hearing, and she did not want to call her at trial. *Id.* at 17-19, 29-30. Young thought Sanders would have credibility problems because she never mentioned an alleged conversation with the victim about not knowing who robbed him in her prior testimony. Young concluded that Sanders' testimony would be cumulative to Barber's testimony, but it could also be harmful to the defense. *Id.* at 29-30. Young and Manciel discussed the pros and cons of calling Sanders, and together made the decision not to call her as a witness. *Id.* at 17-18, 25-26, 29-30.

The first time Manciel brought up the name Barbara West to counsel was immediately before his second trial. *Id.* at 12-13. Manciel informed her

that West would testify that Manciel never socialized with Hosea outside his apartment in the summer. *Id.* at 69-70.

Young then spoke with West about what Manciel said West told him. West became agitated and told Young that she did not pay attention or watch who was sitting outside every day. And she told her she could not testify that Manciel never sat outside with Hosea. ECF 5-13, at 60-66, 118-119; ECF 5-14, at 14, 28. Young advised Manciel that she did not believe that West would make a good witness, and together they decided not to call her at trial. *Id.*

Diane Sanders testified at the hearing that she was William Barber's wife and that they were close friends with Manciel and Harris-Stevens. They lived in the same apartment complex. ECF No. 14-5, at 18, 32. According to Sanders, around 9:30-9:45 p.m. on the night of the incident, she and Barber were home in their second-floor apartment when Manciel telephoned Barber to ask him for a ride to work. *Id.* at 7-8, 19-23. Sanders testified that she went along with Barber to drive Manciel to work. *Id.* at 8-9, 19-20.

Sanders testified that the victim's caretaker told her about the incident the next day. *Id.* at 27-29. A few days later, the caretaker told Sanders that the victim told her that Manciel was the man who robbed him. *Id.* at 15-17,

30-31, 36-38, 42. Sanders testified that she and Barber later spoke with the victim, and he told them that he did not know who committed the crime. *Id.* at 37-43. She was under the impression, however, that the victim simply did not want to tell her and Barber that he believed Manziel robbed her because she knew that the victim had already identified Manziel to his caretaker. *Id.* at 48-50.

Barbara West testified at the hearing that she was the apartment complex manager where the victim and Manciel resided at the time of the incident. ECF No. 14-8, at 61. Her office was located across the courtyard from Hosea's apartment, so she could see Hosea when he would sit on his front porch when the weather was good. *Id.* at 63-67. West could not recall seeing Manciel with Hosea outside his apartment, but she explained that she could not testify that the two were never together because she was not always watching and did not know what occurred when she was not at work. *Id.* at 67-68, 74-78, 88-90, 111. West testified that she spoke to Manciel's trial attorney three or four times and told her that she could not testify that Manciel never visited with Hosea. *Id.* at 74-78, 101-111.

The trial court denied the motion for new trial in an order dated January 12, 2021, finding that Manciel did not demonstrate that his counsel was

ineffective for failing to call Sanders or West. Order, ECF No. 14-19, PageID.3552-59.

Manciel then filed an appellate brief in the Michigan Court of Appeals that raised the following claims:

> I. The trial court abused its discretion in denying Manciel's motion for a new trial based on newly discovered evidence.
>
> II. Trial counsel was ineffective for failing to call two alibi witnesses.
>
> III. The trial court erred by giving a non-standard instruction during voir dire.
>
> IV. The trial court failed to articulate any reason for imposing consecutive sentencing.

Manciel also filed a supplemental pro se brief that raised an additional set of claims:

> I. Was Defendant deprived of a fair trial and the effective assistance of counsel and did the trial court during its examination of two police witnesses pierce the veil of judicial impartiality and did defense counsel fail to object.
>
> II. Defendant is entitled to resentencing where the trial court's scoring of offender variables 1, 2, 3, 10 & 16 was based upon facts found by the sentencing judge that were not admitted by the defendant, or found by a jury, nor supported by sufficient evidence causing an unjust increase in defendant's minimum sentencing guidelines range. And can the failure to trial counsel to object to the scoring of OV's 3, 10, & 16 be attributed to ineffective of trial counsel at sentencing.

III. The trial court's findings that defendant was in possession of "newly discovered evidence" during his second trial, and therefore required to disclose such evidence at his second trial, misses the mark due to the fact defendant had no sufficiently adequate evidence at his disposal until the affidavit of the actual culprit, Allen Aikens, had been Secured.

IV. The trial court's reliance on defense attorney Cena Gray's prior testimony that was subsequently found to be incredible by trial Judge James Callahan is a violation of defendant's fourteenth amendment right to due process in that the lower court's ruling runs afoul of issue estoppel.

The Michigan Court of Appeals affirmed in an unpublished opinion. *People v. Manciel*, No. 335156, 2022 WL 1274922, at *1-2 (Mich. Ct. App. Apr. 28, 2022). Manciel appealed to the Michigan Supreme Court, but his application for leave to appeal was denied by standard order. *People v. Manciel*, 980 N.W.2d 694 (Mich. 2022) (Table).

Manciel subsequently filed his federal habeas petition, raising most of the claims he presented to the state courts. ECF No. 1. In his reply brief, however, Manciel chose to abandon all but three of his claims, conceding that the others did not present federal issues. ECF No. 17, PageID.4245.

## II.     Standard of Review

A § 2254 habeas petition is governed by the heightened standard of review set forth in the Anti-Terrorism and Effective Death Penalty Act

(AEDPA). 28 U.S.C. § 2254. To obtain relief, habeas petitioners who raise claims adjudicated by state courts must "show that the relevant state-court 'decision' (1) 'was contrary to, or involved an unreasonable application of, clearly established Federal law,' or (2) 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.'" *Wilson v. Sellers*, 138 S. Ct. 1188, 1191 (2018)(quoting 28 U.S.C. § 2254(d)).

The focus of this standard "is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). "AEDPA thus imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766, 773 (2010)(internal citations and quotation marks omitted).

Ultimately, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011)(quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Additionally, a state court's factual determinations are presumed

- 12 -

correct on federal habeas review, 28 U.S.C. § 2254(e)(1), and review is "limited to the record that was before the state court." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

## III.  Discussion

### A.  Ineffective Assistance of Counsel

Manciel first claims that his trial counsel was ineffective for failing to call Sanders and West as defense witnesses at his second trial. After reciting the governing constitutional standard, the Michigan Court of Appeals rejected this claim on the merits as follows:

> Defendant has not demonstrated that trial counsel's decision not to call Sanders as a witness fell below an objective standard of reasonableness, or that counsel's decision was not based on a complete and thorough investigation. Defendant argues that Sanders could have also supported his alibi defense, and further, could have offered testimony that she spoke to Hosea after the offense and Hosea told her that he did not know the identity of the intruder. The record indicates that defense counsel was aware that defendant had suggested calling Sanders for these two purposes. Although defense counsel admitted that she did not interview Sanders, counsel explained that she had the benefit of Sanders's prior testimony from the *Ginther* hearing after defendant's first trial and her decision not to call Sanders as a witness was based on her review of that testimony. In particular, counsel was concerned that Sanders was asked about a conversation with Hosea, but she did not mention that Hosea made any statement about not knowing who broke into his apartment. Counsel further explained that she and defendant discussed the pros and cons of calling Sanders as a witness, including that her alibi testimony would be cumulative of

- 13 -

Barber's testimony, and that her prior testimony could be used against defendant if she were called to offer any testimony about an alleged conversation with Hosea. It is apparent from the record that counsel's decision whether to call Sanders as a witness was strategic, and the record also discloses that counsel's decision was based on a reasonable investigation of what information Sanders could offer because counsel had a record of Sanders's prior testimony at defendant's first *Ginther* hearing, which counsel reviewed and discussed with defendant. Counsel had a reasonable basis for concluding that Sanders's proposed alibi testimony would be cumulative of Sanders's (sic) testimony, and that any proposed testimony regarding a conversation with Hosea could be undermined by the prosecution, given the omission in Sanders's prior testimony regarding any such conversation when asked. Defendant has not overcome the presumption that counsel's decision not to call Sanders as a witness was reasonable trial strategy.

Defendant also faults counsel for not calling Barbara West, the manager at defendant and Hosea's apartment complex, who defendant claims could have refuted Hosea's claim that he and defendant often socialized together. Defense counsel admitted that defendant had suggested calling West as a witness for this purpose. However, counsel explained that when she contacted West, West told her that she would not be able to testify in the manner that defendant had claimed. Specifically, when counsel asked West if she could testify that she had "never" seen defendant and Hosea outside drinking together, West told her "she couldn't testify to that." According to counsel, West stated that "she did not pay attention to who was sitting outside every day." Counsel explained that she initially thought that West's testimony would have been important to defendant's defense, but once West told her that she could not testify that she never saw defendant and Hosea socializing together, she decided not to call her as a witness. In sum, the record discloses that defense counsel had a reasonable basis, formed after an investigation of West's potential testimony, for not calling West at trial. Defendant

has not overcome the presumption that counsel's decision not to call West as a witness was reasonable trial strategy.[3]

Defendant also asserts that West could have testified that Hosea did not identify defendant as a suspect. However, West never claimed that Hosea denied knowing the intruder or identified someone else as the intruder. She merely testified that when she spoke to Hosea, he never shared with her any suspicions about who he thought broke into his apartment. Any testimony to this effect would have had little probative value regarding whether Hosea misidentified defendant as the intruder. Thus, counsel's decision not to call West for this purpose was not objectively unreasonable, and further, there is no reasonable probability that the outcome of defendant's trial would have been different had this insignificant testimony been presented.

___

[3] We acknowledge defendant's argument that the trial court appears to have erroneously attributed the relationship that Harris-Stevens had with defendant to West. We agree that the trial court appears to have confused West with Harris Stevens. The court's comments about the relationship between defendant and West were factually applicable to Harris-Stevens, not West. However, the nature of West's relationship with defendant was not material to trial counsel's decision not to call West as a witness. Rather, counsel did not call West because she was unable to testify in the manner suggested by defendant. Thus, counsel had a legitimate reason, grounded in the lack of helpful information that West could provide, for not calling West as a witness. As explained, defendant has not overcome the presumption that trial counsel's decision was objectively reasonable.

*Manciel*, 2022 WL 1274922, at *2-4.

A petitioner claiming a violation of his Sixth Amendment right to the

effective assistance of counsel must show that counsel's performance was

deficient, and that the deficiency prejudiced the defense. *Strickland v. Washington,* 466 U.S. 668, 687 (1984). An attorney's performance is deficient if "counsel's representation fell below an objective standard of reasonableness." *Id*. at 688. The petitioner must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. at 687. "Judicial scrutiny of counsel's performance must be highly deferential." *Id*. at 689. The Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct and instead [has] emphasized that the proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Wiggins*, 539 U.S. at 521 (quoting *Strickland*, 466 U.S. at 688) (quotation marks omitted). And where the challenged conduct amounts to legitimate trial strategy, habeas courts will not find that counsel performed deficiently. *Robins v. Fortner*, 698 F.3d 317, 337-38 (6th Cir. 2012).

The decision of the state court reasonably applied the *Strickland* performance-prong. For a state court's adjudication of a *Strickland* claim to be "unreasonable" under 28 U.S.C. §2254(d)(1), it "must have been 'so lacking in justification' that it amounts to 'an error well understood and

comprehended in existing law beyond any possibility for fairminded disagreement.'" *Hendrix v. Palmer*, 893 F.3d 906, 922 (6th Cir. 2018) (quoting *Harrington*, 562 U.S. at 103).

Manciel's trial attorney testified why she decided not to call Sanders and West as witnesses. With respect to Sanders, counsel believed she was a poor witness, and her proposed testimony would have been inconsistent with her husband's testimony. Barber testified that Manciel's wife was with them at their apartment the evening of the incident and accompanied them to drive Manciel to work, that they drove in Manciel's company truck, and that Manciel started moving out of his apartment the next day. ECF No. 14-1, at 67-87, 113. Sanders, on the other hand, testified at the first hearing that Manciel's wife was not with them on the evening of the incident, that they drove Manciel to work in Barber's vehicle, and that Manciel was moving out before the date of the incident. ECF No. 14-5, at 21-29. Accordingly, calling Sanders would have resulted in the presentation of an alibi witness whose account differed from the one provided by Barber.

Moreover, despite repeated prodding, Sanders did not testify at the hearing after the first trial that she heard the victim say he did not know who robbed him. ECF No. 13-6, at 88-90. In any event, at the second hearing,

Sanders testified that it appeared that the victim was not being truthful when he told her that he didn't know who the perpetrator was. Rather, it appeared to her that the victim did not want to reveal that he believed the perpetrator was Manciel, because Sanders knew that the victim had already identified Manciel to his caretaker. ECF 14-5, at 48-50. Sanders' proposed testimony was therefore subject to impeachment and not nearly as beneficial to the defense as Manciel claims.

With respect to West, Manciel told his counsel that she would testify that he never socialized with the victim. But when counsel interviewed West, she became agitated and said she could not testify to that claim. It reasonably appeared to counsel that West would be an uncooperative and unhelpful witness.

"Strategic choices by counsel, while not necessarily those a federal judge in hindsight might make, do not rise to the level of a Sixth Amendment violation." *McMeans v. Brigano*, 228 F.3d 674, 682 (6th Cir. 2000). Given the record developed at trial and the state court evidentiary hearings, a reasonable basis existed to reject the claim. Manciel therefore fails to demonstrate entitlement to relief based on this claim. *Hendrix*, 893 F.3d at 922.

- 18 -

## B. Trial Court's Comments During Jury Selection

Manciel next claims that the trial court minimized the prosecution's burden of proof during jury selection by informing the venire that scientific evidence is seldom as available at trial as portrayed on fictional accounts on television. Respondent asserts that the claim is barred from review because the state court based its decision on Manciel's failure to contemporaneously object to the comment.

Where it is easier to determine that a habeas petitioner's claim is without substantive merit than it is to determine whether it has been procedurally defaulted, the Court may proceed to the merits. *See, e.g., Hudson v. Jones*, 351 F.3d 212, 215-16 (6th Cir. 2003) (bypassing the procedural default issue in an "especially complex" case); c.f. *Sheffield v. Burt*, 731 F. App'x 438, 441 (6th Cir. 2018) ("[W]here a straightforward analysis of settled state procedural default law is possible, federal courts cannot justify bypassing the procedural default issue.") Because Manciel claims that his counsel was ineffective for failing to object to the comment, to determine whether the claim is inexcusably defaulted, the Court would eventually find itself in the position of evaluating the prejudicial impact of the

- 19 -

comment itself. Therefore, it is simpler for the Court to proceed to the merits of the underlying claim.

In conducting its plain error analysis, the Michigan Court of Appeals stated as follows:

> A jury must be instructed so that it may correctly and intelligently decide the case. *People v. Traver*, 502 Mich. 23, 31 (2018). A trial court must properly instruct the jury so that it may correctly and intelligently decide the case. This Court reviews jury instructions as a whole, rather than piecemeal, to determine whether any error occurred. *Id*. "Even if the instructions are imperfect, there is no error if they fairly presented the issues to be tried and sufficiently protected the defendant's rights." *People v. Blevins*, 314 Mich. App. 339, 353 (2016).

> Defendant challenges the following instruction, which was given during jury voir dire:

>> This is not Law and Order, this is not CSI, or NCIS, or Castle or any of those other television programs that you and I have come to enjoy, those are dramas, they are not real life. There may or may not be scientific evidence presented in this case. Scientific evidence in the real world, not fiction, is seldom if ever available let alone presented as evidence, and this includes DNA evidence, fingerprint evidence or ballistics or other firearm laboratory evidence.

> We are not persuaded that the challenged comments constitute plain error. Defendant asserts that one of the weaknesses of the prosecution's case was the lack of physical or scientific evidence, and he contends that the court's comments minimized this weakness by undermining the importance or significance of such evidence. While the

- 20 -

challenged instruction may not be a model of perfection, viewed in their entirety, the trial court's instructions set forth the issues to be tried and adequately protected defendant's rights. *Blevins*, 314 Mich. App. at 353. The challenged comments were rather brief, and they were made at the outset of jury voir dire, after addressing courtroom policies and immediately before discussing the jury's role in the criminal justice process. The remarks were not made in the context of any instruction directed at the jury's consideration of the evidence in the case, or at any party's theory of the case. Defendant complains that the remarks undermined the significance of a weakness in the prosecution's case, that being the absence of any physical or scientific evidence. However, the court's remarks were not directed at the specific facts of this case. Indeed, the court commented that "[t]here may or may not be scientific evidence presented in this case" (emphasis added). Further, we are not persuaded that the jury was somehow misled with regard to the prosecution's burden of proof. The trial court repeatedly informed the jury on the prosecution's burden to prove defendant's guilt beyond a reasonable doubt, including his identity as the assailant who committed the home invasion and unarmed robbery. While the trial court arguably made a misstep by stating that physical and scientific evidence "is seldom if ever available," considering the limited context in which that remark was made and that the trial court's remaining instructions properly advised the jury on how to consider evidence and the prosecution's burden of proof, we are satisfied that the instructions as a whole sufficiently protected defendant's rights. Accordingly, any error did not affect defendant's substantial rights and reversal is not warranted.

*Manciel*, 2022 WL 1274922, at *6.

Viewed as an erroneous jury instruction claim, to establish a due process violation, a habeas petitioner must show that the instruction was "so infirm that [it] rendered the entire trial fundamentally unfair." *Coe v. Bell*, 161

F.3d 320, 329 (6th Cir. 1998). An improper jury instruction warrants habeas relief only if it "so infected the entire trial that the resulting conviction violates due process." *Levingston v. Warden, Warren Corr. Inst.*, 891 F.3d 251, 255 (6th Cir. 2018) (quoting *Cupp v. Naughten*, 414 U.S. 141, 147, 94 S. Ct. 396, 38 L. Ed. 2d 368 (1973)).

Manciel's claim, however, does not present a paradigmatic jury instruction claim. The complained of remark did not occur during the jury instructions following trial, nor did it occur as part of a ruling made during the presentation of evidence. Rather, the remark was made at the beginning of jury selection, and it fell between a discussion concerning general courtroom policies and a discussion regarding the jury's role in the criminal justice process. ECF No. 13-22, PageID.1165-66.

The claim is therefore more appropriately analyzed as an alleged prejudicial comment made by the trial court during the course of trial. A trial judge's comments upon the quality of the evidence during a criminal trial generally do not provide a basis to collaterally attack a conviction unless the comments rise to the level of a constitutional violation. *McBee v. Grant*, 763 F.2d 811, 817-18 (6th Cir. 1985). Reversable error occurs "where the judge's remarks clearly indicate a hostility to one of the parties, or an unwarranted

prejudgment of the merits of the case, or an alignment on the part of the Court with one of the parties." *United States v. Ross*, 703 F.3d 856, 878 (6th Cir. 2012) (quoting *United States v. Blood*, 435 F.3d 612, 629 (6th Cir. 2006)). "To show constitutionally improper prejudice, a judge's comments must 'display a deep-seated favoritism or antagonism that would make fair judgment impossible.'" *Bailey v. Smith*, 492 F. App'x 619, 630-31 (6th Cir. 2012) (quoting *Liteky v. United States*, 510 U.S. 540, 555 (1994)); *see Coley v. Bagley*, 706 F.3d 741, 750 (6th Cir. 2013).

The comment here does not warrant habeas relief. The comment was brief and did not suggest that the court was hostile to either party. It did not suggest that the court had formed an opinion about the merits of the case, nor did anything about it make a fair judgment by the jury impossible.

Manciel asserts that the comment effectively lowered the prosecutor's burden of proof by informing the jury that it should be satisfied with proofs that lacked scientific evidence. It is true that a trial judge cannot take from the jury the basic function of determining the weight to place on different forms of evidence. But it is also true that a judge may "analyze the evidence, comment upon it, and express his [or her] views with regard to the trial testimony of the witnesses.'" *United States v. Holloway*, 257 F. App'x 869,

872-73 (6th Cir. 2007) (quoting *United States v. Glover*, 21 F.3d 133, 137 (6th Cir. 1994)).

The statement here merely generically commented on the differences the jury was likely to encounter between what they had viewed on fictional television dramas and what occurs in "real life." The court did not suggest that the jury should convict the defendant despite scientific evidence – it merely informed them not to expect to be presented with such evidence.  At the close of trial, the court dispelled any improper suggestion when it properly instructed the jury on the prosecutor's burden of proof, that their decision must be based on the evidence presented at trial, and that the court's earlier statements and rulings were not evidence. ECF No. 14-2, PageID.1438-44.

In light of this record, the state court reasonably concluded that the comment did not warrant reversal of Manciel's conviction. Manciel fails to demonstrate entitlement to habeas relief with respect to this claim.

### C. Trial Court's Examination of Witnesses

Manciel's final claim asserts that the trial judge committed misconduct by questioning two police witnesses at trial in a manner that bolstered the prosecutor's case. As with the previous claim, the Michigan Court of Appeals found that the claim was subject to the plain error standard because no

objection was made at trial. After reciting the standard governing claims of judicial misconduct, the state court found that Manciel failed to demonstrate entitlement to relief:

> The trial court's questioning of Sergeant Johnson was focused on understanding the police investigation after the home invasion, including what specific steps were undertaken to look for evidence. There is nothing in the trial court's questioning that is overtly inappropriate. Similarly, the prosecutor's and defense counsel's examination of Lieutenant Duda had caused confusion regarding whether the "back brace suspender combination" that Lieutenant Duda described was consistent with the suspenders that the police were looking for at defendant's apartment. The trial court's questioning of Lieutenant Duda was very brief, and was aimed at clarifying whether the witness's description of the "braces" that he recovered was consistent with the "suspenders" taken from Hosea's apartment and described in the search warrant. There was nothing overtly inappropriate about this line of questioning, which was very limited, and it did not exhibit partiality or provide a strategic advantage to either side.
>
> ***
>
> Considering the totality of the circumstances, the trial court did not pierce the veil of judicial impartiality. The challenged conduct is limited to the questioning of two witnesses, which is not itself improper. Moreover, we disagree with defendant's contention that the questioning reflected partiality in favor of the prosecution or bias against defendant. Rather, the questioning was intended to clarify matters related to the scope of the police investigation, and there is no overt indication that the questions were asked in a manner that demonstrated favoritism or partiality for or against either side. Furthermore, to the extent that there was any risk that the court's questioning of witnesses could be perceived as reflecting the court's partiality, we are satisfied that the trial court's preliminary and final jury instructions adequately

alleviated that risk and safeguarded defendant's right to a fair trial.

*Manciel*, 2022 WL 1274922, at \*8-10.

A trial judge may interject himself or herself "into the trial, speak to counsel, and question witnesses in order to clear up confusion regarding the evidence or aid in its orderly presentation." *United States v. Powers*, 500 F.3d 500, 511 (6th Cir. 2007). It is not unconstitutional under the Due Process Clause for a state trial judge to seek clarification from witnesses at a criminal trial. *Brown v. Palmer*, 358 F. Supp. 2d at 657; *See also Wenglikowski v. Jones*, 306 F. Supp. 2d 688, 695 (E.D. Mich. 2004). "In fact, it is proper for a judge to question a witness when necessary either to elicit the truth or to clarify testimony." *Brown*, 358 F. Supp. 2d at 657.

The state court reasonably found that the trial court's questioning of the two police witnesses was not improper. Sergeant Johnson testified that he was with the first responding unit. He did not have much independent recollection from the date and relied on his police report. The report indicated that a glove coming from the perpetrator was recovered, but Johnson could not say whether it was found inside or outside of the victim's apartment. He also didn't recall what he did to locate Manciel at the apartment complex that evening, or whether he contacted the apartment manager about locating

- 26 -

him. It is clear from the trial court's subsequent questioning that the court was bothered by Johnson's lack of preparation for trial and by his apparently cavalier attitude towards the investigation of a serious crime. ECF No. 14-1, PageID.1297-1303. If anything, the court's questioning of Johnson aided the defense by tending to suggest that the Johnson's investigation had not been thorough. In light of the record, the state court correctly found that nothing about the trial court's questioning of Johnson worked to Manciel's disadvantage.

The same thing is true with respect to the court's examination of Lt. Duda. During his testimony it became apparent that there was confusion whether the lawyers and witness were referring to different things when they referred to suspenders and back braces. The trial court's single brief question to Duda was to ascertain whether he was aware that braces was another term for suspenders. *Id*., PageID.1323. The question fell well within the court's discretionary authority to clarify the witness's testimony.

Manciel fails to demonstrate entitlement to relief with respect to this claim.

### D. Abandoned Claims

- 27 -

Manciel's petition raised additional claims that have now been abandoned. *See Richardson v. Campbell*, 2021 U.S. Dist. LEXIS 55596, *31-32, 2021 WL 1122218 (E.D. Mich. March 24, 2021). The petition asserted a free-standing claim that Manciel is entitled to a new trial in light of new evidence of his innocence, and it also asserted two state-law sentencing claims. In his reply brief Manciel abandoned these claims, noting they were state law issues not cognizable on federal habeas review. *See* ECF No. 17, PageID.4245. Manciel clarified that he wishes to proceed only on the three claims addressed above. *Id.*

Manciel is correct that the abandoned claims are not cognizable on federal habeas review. *See Cress v. Palmer*, 484 F.3d 844, 854 (6th Cir. 2007) (free-standing claims of actual innocence based on newly discovered evidence are not cognizable on federal habeas review absent an independent constitutional violation occurring in the underlying state criminal proceeding); *See also Baker v. Barrett*, 16 F. Supp. 3d 815, 837 (E.D. Mich. 2014) (citations omitted) ("A habeas petitioner's claim that the trial court violated state law when sentencing him is not cognizable in habeas corpus proceedings.").

IV.    **Certificate of Appealability**

Before appealing this decision, Manciel must obtain a certificate of appealability. The Court denies a certificate of appealability because jurists of reason would not find it debatable that the claims raised in the petition are without merit. 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). The Court also denies permission to appeal *in forma pauperis* because any appeal of this decision could not be taken in good faith. 28 U.S.C. § 1915(a)(3).

## V.    Order

Accordingly, the Court **DENIES** the petition for a writ of habeas corpus, **DENIES** a certificate of appealability, and **DENIES** permission to appeal *in forma pauperis.*

**IT IS SO ORDERED**.

s/Shalina D. Kumar
Shalina D. Kumar
United States District Judge

Dated: April 14, 2026

- 29 -